UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JERRY HILL,

Plaintiff,

v.

RAND BEERS, Secretary, United States Department of Homeland Security,

Defendant.

Case No.: 3:12-CV-00574-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Jerry Hill ("Hill") filed this action against Rand Beers ("Beers"), the current[1] Secretary of the United States Department of Homeland Security (the "Department"), as the parent organization of his former employer, the Transportation Security Administration (the

[1]The action was initially filed against Janet Napolitano, the individual serving as Secretary of the Department at the time the complaint was filed.

"Administration"), for violations of the Age Discrimination in Employment Act (29 U.S.C. §§ 621-634)(the "Act"). Presently before the court is Beers's motion for summary judgment.[2]

The court finds Hill has failed to establish that he suffered an adverse employment action and, therefore, is unable to support a *prima facie* claim for discrimination under the Act. Accordingly, Beers's motion for summary judgment is granted.[3]

*Background*

On February 27, 2002, the United States Office of Personnel Management (the "Office") granted the Department the "authority to waive the dual compensation reduction (salary offset) to hire Federal retirees to help start up the Transportation Security Administration." (Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. ("Def.'s Mem.") Ex. 2 at 1.) Such authority was limited to hiring "an employee serving on a temporary basis, but only if, and for so long as, the authority is necessary due to an emergency involving a direct threat to life and property or other unusual circumstances." (Def.'s Mem. Ex. 2 at 1, quoting 5 U.S.C. § 8344(i).) The authority for the waiver of the dual compensation reduction ("Waiver") was based on the September 11th attacks, the enormity of the responsibilities given the Administration, the urgent need for experienced professionals to staff the Department, and the lack of alternative staffing options. (Def.'s Mem. Ex. 2 at 1.)

On July 30, 2004, the Administration offered Hill, who was planning to retire from the

---

[2]Beers filed a motion to dismiss or, in the alternative, for summary judgment. The court allowed Hill to engage in discovery to respond to the motion, thereby converting the motion to one for summary judgment.

[3]The parties have consented to jurisdiction by magistrate in accordance with 28 U.S.C. § 636(c)(1).

Federal Bureau of Investigation ("FBI"), a permanent appointment as a criminal investigator advising Hill that "[a]s a reemployed annuitant your annuity will continue. However, during your period of employment, your salary will be reduced by the amount of your annuity." (Def.'s Mem. Ex. 4.) Hill declined the offer "due to the dual compensation restrictions regarding my retirement income from the FBI" and requested he be considered for a Waiver. (Def.'s Mem. Ex. 5.) On September 8, 2004, the Department approved a Waiver for Hill's appointment as an Assistant Federal Security Director for Law Enforcement ("Assistant Security Director") at the airport in Portland, Oregon, for a term of three years. (Def.'s Mem. Ex. 6 at 1.) Hill was granted a Waiver at this time "because efforts to recruit for the position has been unsuccessful." (Def.'s Mem. Ex. 16 at 5.) The Department intentionally limited the duration of Hill's Waiver to "three years with the requirement that TSA identify a pool of candidates who have the potential to be permanent successors to the position and to be prepared to competitively recruit for the position in the future." (Def.'s Mem. Ex. 16 at 5.) Hill retired from the FBI effective October 14, 2004, and accepted the three-year appointment with the Department effective October 17, 2004. (Def.'s Mem. Ex. 7, 8.)

A year later, on October 18, 2005, Gale Rossides, the Assistant Administrator of the Administration ("Rossides"), told Arthur Gordon, an Assistant Security Director in Maryland, that she did not support renewing the Waivers because they blocked the career paths of younger employees. (Farra Decl. Ex. H at 1, 3.) She stated that "[y]ou guys (referring to the Rehired Annuitants) would have to step aside so the younger people can move up." (Farra Decl. Ex. H at 1, 3.)[4] Early in 2006, the Administration established the Executive Resources Council ("ERC") to

---

[4]Beers argues that some evidence of "vague remarks about 'old white guys'" is inadmissible hearsay and inherently unreliable. Assuming that Beers is referring to Rossides's statement, it is being offered to prove that Rossides made the statement in support of Hill's argument that Rossides

advise the Administration with regard to "recruitment, assessment and selection of executives representing the nation's diversity, their compensation and benefit packages; the executive performance management and awards process, and certification of professional development activities to strengthen the executive cadre at TSA." (Def.'s Reply Ex. 2 at 1.) Rossides served as the Chair of the ERC during the relevant period. (Farra Decl. Ex. P at 1.)

In the summer of 2006, the Office reconsidered the need for Waivers. In a letter dated June 12, 2006, the Office recognized that in the future, "[t]he need to hire annuitants will diminish because of TSA's diligent external recruitment efforts and internal development of successors." (Def.'s Mem. Ex. 9 at 1.) The letter also noted that recruitment for Assistant Security Director positions was occurring "on a regular basis using vacancy announcements, typically for a two-week period, for specific locations." (Def.'s Mem. Ex. 9 at 1.) About the same time, the Department anticipated that the number of extensions granted to those currently working under Waivers would be extremely limited to allow the Department to "develop a cadre for the long term future of the agency." (Def.'s Mem. Ex. 10 at 3.) The Department noted that "[a] recruitment plan, which provides upward mobility for current employees and which targets minority and female applicants, is being designed and will provide TSA with a vibrant, diverse population of senior leadership." (Def.'s Mem. Ex. 10 at 3.)

The ERC approved a "Succession Plan for TSA" (the "Plan") in June 2006. (Def.'s Reply Ex. 3.) The Plan addressed the primary concerns that forty percent of the Administration's executive would retire after five years based, in part, on the significant numbers of leaders with Waivers

---

was biased against older employees, not the truth of statement made by Rossides. Accordingly, the statement is not hearsay and is admissible for this purpose.

expiring in 2007 and 2008, as well as the lower than desirable level of diversity (minorities and females) among the Administration's leadership. (Def.'s Reply Ex. 3 at 5.) The specific succession planning goals for the Administration identified in September 2006 were:

> • Develop replacements for TSA executives and senior leaders eligible for retirement over next 5 years
>
> • Provide upward mobility for TSA employees
>
> • Develop leadership competencies needed for senior and mid-level management at TSA
>
> • Increase diversity of TSA's leadership bench
>
> • Maximize retention of TSA's leadership talent

(Supp. to Def.'s Reply at 2.) The Administration intended to fill senior level management positions with mid-level managers, such as Assistant Security Directors. (Supp. to Def.'s Reply at 7.) Therefore, it was imperative that the Administration fill Assistant Security Director positions with individuals willing and capable of becoming senior management leaders within a five-year period.

In the fall of 2006, the Administration held three Federal Security Director Conferences to discuss the future of the Administration. (Farra Decl. Ex. I at 2.) During each of those conferences, Michael Restovich ("Restovich"), then Assistant Administrator of the Administration, used the expression "old white guys" to refer to himself and approximately eighty-five to ninety percent of the federal security directors in attendance. (Farra Decl. Ex. I at 2.) Restovich later explained that he used the term to:

> stress that both the DHS and TSA have goals and objectives to improve our diversity at the leadership level and that it was their responsibility to develop the next generation of leaders. I said that we did not have time in the beginning of TSA to get a diversity of leadership. By diversity, I meant diversity of background, ideas, and people. TSA's leadership came largely from law enforcement and the military. It

> was a second or third career for many of them. I said that going forward we, meaning myself and the attendees, needed to do a better job of developing the next group of leaders. It was later brought to my attention that my statements were not well received by some attendees, and I took steps to convey reassurances that we were not trying [to] force any employee out.

(Farra Decl. Ex. I at 3.) Restovich also explained that:

> [a]t the time of the conferences, no decision had been made by TSA or DHS relative to Rehired Annuitants, and any discussion of them would have been premature. I may have said in informal and formal discussions that the likelihood of extending the appointments of the Rehired Annuitants was not good but we did not know for sure. We had heard that to extend an appointment, we would have to prove that no one else in the agency could do the job, and that was not so easy after five years of working, training, and preparing others for leadership positions.

(Farra Decl. Ex. I at 2-3.) John McCaffrey and David Bassett, federal security directors in attendance at one of the conferences, commented that Restovich said something like "[r]ehired annuitants would have to step aside so TSA could hire more minorities. Look around, you're all old white and gray haired." (Farra Decl. Ex. J at 3, Ex. K at 2-3.)[5] Various federal security directors referred to one of the conferences as the "first annual meeting of the newly chartered Pathetic Old Whiteguy club" in emails exchanged after a conference. (Farra Decl. Ex. M.)

In a letter dated November 14, 2006, the Administration informed Hill of the Department's new position on Waivers, advised him that very few employees would be granted Waiver extensions, and assured him that he would be notified of the decision with regard to his Waiver six months before its expiration. (Def.'s Mem. Ex. 11.) By letter dated February 16, 2007, addressed to Richard Whitford, Assistant Administrator of Human Capital for the Administration ("Whitford"), Michael Irwin, Federal Security Director for Portland, Oregon ("Irwin"), and Hill's supervisor,

[5]Again, if Beers is objecting to this statement as inadmissible hearsay, the objection is overruled. Hill is offering the statement to establish that Restovich wanted to get rid of the Administration's older employees, not that the audience was old, white and gray haired.

requested a two-year extension of Hill's Waiver, acknowledging that the extension of a Waiver is "considered based on the 'continuance of critical leadership positions at key locations and if no other reasonable staffing options exists.' " (Hill Decl. Ex. F at 2.) Irwin explained that at the time of his hiring, Hill was advised by the previous Federal Security Director that extending his Waiver an additional two-years would be a "routine matter." (Hill Decl. Ex. F at 2.) Irwin also described in detail Hill's twenty-one years of experience and his accomplishments as an FBI agent, as well as his stellar performance as an Assistant Security Director.[6] (Hill Decl. Ex. F at 2-5.) In conclusion, Irwin stated "I support and highly recommend that every consideration be given to the extension of the dual compensation waiver for [Hill] for a period of two years and five years total." (Hill Decl. Ex. F at 6.)

On April 3, 2007, the Administration sent a letter to Hill informing him that his existing Waiver would not be extended. (Def.'s Mem. Ex. 12.) The Administration then explained that:

> During the upcoming months the ERC, Office of Human Capital and executive leadership will continue to implement a succession strategy. This strategy may include offering you the opportunity to continue your service, without a waiver and with ERC approval. Should you decide not to continue in your position without a waiver, our goal is to ensure that we identify a successor to assume your responsibilities and position prior to the expiration date of your current waiver. If you are interested in being considered for continued employment without a waiver, you should notify your manager in writing within ten days of receiving this letter. Please note, however, that indicated interest in continued employment does not guarantee such employment. The ERC has the authority to make final decisions based on the overall needs of the organization.

(Def.'s Mem. Ex. 12.) Hill advised the Department of his "wish to exercise my option to continue my employment with TSA beyond the Oct. 17, 2007, as a Rehired Annuitant" in a letter hand

---

[6]There is no dispute that Hill performed his responsibilities as an Assistant Security Director in a satisfactory, if not exemplary, manner.

delivered to Irwin and mailed to Whitford on April 24, 2007.[7] (Def.'s Mem. Ex. 13, Hill Decl. ¶5.)

In July 2007, the Administration advised Hill the ERC had decided not to extend Hill's appointment beyond its initial three-year term and that the position would be opened and posted as a vacancy, indicating a desire to comply with the Administration's succession plan to "ensure the diverse skill and experience needed to lead TSA well into the future." (Def.'s Mem. Ex. 14.) The Administration then invited Hill "to apply for the position on a permanent basis." (Def.'s Mem. Ex. 14.) Rossides and Whitford were present at the ERC meeting in which the decision on Hill's interest in continuing his employment without a waiver was addressed; Restovich was not. (Farra Decl. Ex. P at 1.)

On September 14, 2007, the Federal Air Marshal Service posted a vacancy for an Assistant Security Director position at six duty locations, including Portland, Oregon. (Def.'s Reply Ex. 3 at 79.) The posting specifically required that applicants apply for the vacancy online before the closing date of November 5, 2007. (Def.'s Reply Ex. 3 at 79, 80.) Hill did not apply for the open position. (Def.'s Mem. Ex. 16 at 5.) Hill felt that because the Administration and the ERC knew of his qualifications and accomplishments when it decided not to continue his employment beyond his initial three-year term, his applying for the open position would have been a futile gesture. (Hill Decs l. ¶ 16.) Hill's appointment as Assistant Director expired on October 16, 2007. (Def.'s Mem. Ex. 15.) Hill was fifty-six years old at time his appointment terminated. (Hill Decl. ¶ 17.) Hill was replaced by Edward Kinateder, a white male just over ten years younger than him. (Hill Decl. ¶ 17.)

---

[7]The letter is dated April 14, 2007, but Hill represents that the letter was not provided to the Administration until April 24, 2007. While this appears to establish that Hill did not request continued employment without a Waiver within the requisite ten days, Beers has not made this argument and this question is not before the court.

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2012). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV.

P. 56(c) (2012). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

The Ninth Circuit has cautioned against too readily granting summary judgment in employee discrimination cases because of "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, exceptions, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). Thus, the Ninth Circuit has set "a high standard for granting summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Courts require "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can be resolved only through a searching inquiry – one that is more appropriately conducted by the factfinder upon a full record." *Id.* (internal quotations and citation omitted). Additionally, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder," and thus "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits." *Id.* (*quoting Warren*, 58 F.3d at 443).

Nevertheless, the Ninth Circuit holds that the "[f]ailure to allege 'specific facts' that establish

the existence of a prima facie case renders a grant of summary judgment appropriate." *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1409 (9th Cir. 1987) (citation omitted). Additionally, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimum prima facie case." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994).

*Discussion*

Hill alleges that Beers violated the Act by not extending Hill's employment beyond its initial three-year term. While Hill implies in his complaint that the decision to not extend his Waiver beyond its initial three-year term was based on the age and race of the incumbents, it is evident from his briefing in opposition to Beers's motion for summary judgment that he is not relying on this decision as evidence of age discrimination. Additionally, because Hill concedes that he did not apply for his position after it was posted, it appears that Hill does not allege that the Administration's failure to hire him for the posted new permanent position was discriminatory conduct in violation of the Act. Consequently, Hill's claim is based solely on the decision to not allow Hill to continue serving as Assistant Security Director after his three-year term ended but, rather, to post his position as a vacancy.

Under the Act, employers may not "fail or refuse to hire or to discharge any individual [who is at least forty years old] or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1)(2007). To survive summary judgment on an age discrimination claim, a plaintiff must establish by a preponderance of either direct or circumstantial evidence that the adverse employment action would not have occurred "but for" his age. *Gross v. FBI Fin. Servs. Inc.*,

557 U.S. 167, 177-78 (2009). "But for" causation requires a showing that age was the reason for the adverse employment action. *Id*. at 2350.

"Direct evidence, in the context of an ADEA claim, is defined as 'evidence of conduct or statement by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating fact in the employer's decision.'" *Enlow v. Salem-Keizer Yellow Cab Co.*, Inc., 389 F.3d 802, 812 (9th Cir. 2004)(emphasis omitted)(quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999)). Or, stated more succinctly, "direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)(quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)). Not every comment about a worker's age is direct evidence of a discriminatory motive. "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.'" *Hartung v. Cae Newnes, Inc.*, 229 F. Supp. 2d 1093, 1100 (D. Or. 2002)(quoting *Merrick v. Farmers Inc. Group*, 892 F.2d 1434, 1438-39 (9th Cir 1990).

Absent direct evidence of a discriminatory motive, a plaintiff may establish a *prima facie* case by showing that he: (1) was a member of the class protected by the statutes in question (at least forty years old); (2) was performing his job in a satisfactory manner and in accordance with his employer's legitimate expectations; (3) was subjected to an adverse employment action; and (4) was either replaced by a substantially younger employee with equal or inferior qualifications or was subjected to such action under other circumstances otherwise giving rise to an inference of age

discrimination. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). This inference "can be established by showing that the employer had a 'continuing need for his skills and services in that his various duties were still being performed,'" *Wallis*, 26 F.3d at 891 (citation omitted), or by showing "that others not in his protected class were treated more favorably." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1994).

*A. Direct Evidence*

Hill's only offering of direct evidence of age discrimination is arguably ageist comments made by Rossides and Restovich. The Restovich comment, in which he refers to the audience as old, white, and gray haired, was followed by his statement that the Administration needed to hire more minorities, placing the comment in a racial context. There is no evidence in the record that Restovich ever stated that annuitants should be not be rehired because they were old. Accordingly, Restovich's comments do not support Hill's claim of age discrimination.

Rossides's statement that she did not support renewing the Waivers because they blocked the career paths of younger employees and that the rehired annuitants would have to step aside to allow younger employees to be promoted could be viewed as evidence of age discrimination if Hill was contending that the refusal to extend his Waiver was discriminatory or if he had applied for his position after it was posted. However, Hill is relying solely on the ERC's decision to not extend his employment after the expiration of the initial three-year term without participating in the open application process. Rossides's comments did not relate directly to this decision and should be viewed as merely a "stray remark" that can not be tied in any way to the end of Hill's employment. *Hartung*, 229 F. Supp. 2d at 1100 (stray remark not tied directly to employee's termination does not create inference of discriminatory motive). Additionally, the Administration invited Hill to apply

for the position on a permanent basis indicating a willingness to consider Hill for the new position. Hill's direct evidence is insufficient to support a claim of age discrimination.

*B. Circumstantial Evidence*

Beers concedes that Hill has established the first two elements of the *prima facie* case for age discrimination – he is within the protected class and was performing his job in a satisfactory manner – but asserts that he is unable to establish the final two. Specifically, Beers argues that Hill was not terminated, or subjected to any other adverse employment action. Rather, his three-year appointment ended and he was asked to apply for the new permanent position. Also, Beers argues that because Hill did not apply for the new permanent position, and because the individual hired for the new position was within the protected age range, Hill is unable to establish the requisite inference of discrimination.

1. Adverse Employment Action

A majority of the federal circuit courts, including the Ninth Circuit, take an expansive view of the type of actions that can be considered adverse employment actions. *See, e.g., Ray v. Henderson*, 217 F.3d 1234, 1241-1243 (9th Cir. 2000). Among the employment actions that may constitute an adverse employment action under federal law depending on the circumstances are termination, dissemination of an unfavorable employment reference, issuance of an undeserved negative performance review, refusal to consider for promotion, exclusion from meetings, seminars and positions providing eligibility for salary increases, denial of secretarial support, a more burdensome work schedule, and a lateral transfer. *Id*. at 1241; *see also Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference,

issuance of an undeserved negative performance review and refusal to consider for promotion.").

The evidence establishes that Hill's assignment with the Administration was temporary and intended to last for only three years. Upon the expiration of the three-year term, Hill stood in the shoes of any other prospective applicant for the new position. He was not entitled to preferential treatment with regard to the new position merely because he had previously served in the position for a fixed three-year term.

Once his term expired, Hill requested that he be allowed to continue as the permanent Assistant Security Director for Portland, Oregon. The ERC denied this request, informing Hill that it intended to seek applicants for the position and that he was more than welcome to apply for the position. Accordingly, after the ERC made this decision, the new permanent position remained unfilled and Hill was in the same position as every other individual desiring the opportunity to work as the permanent Assistant Security Director for Portland, Oregon. There is no evidence that the ERC had decided to hire someone younger to fill the position. There is no evidence that anyone younger than Hill would apply for the position. At that point, it was entirely possible that all of the applicants could have been within the protected class or that Hill could have been the only qualified candidate to apply for the new position.

The decision by the ERC to not allow Hill to continue as Assistant Security Director upon the expiration of his employment term, but rather to open the position up for applications, was not an adverse employment decision in light of the opportunity afforded Hill to apply for the new position. Additionally, Hill's decision to not apply for the new position prevents the subsequent hiring of a younger individual from being a discriminatory action.

Hill asserts that he thought he applied for the new position when he informed the ERC that

he wanted to continue in his position with a waiver and provided them information on his extensive law enforcement background. However, when the ERC declined Hill's request, it specifically invited him to apply for the new position. The posting for the new position required interested applicants to apply online. Hill's request to the ERC for continued employment clearly did not constitute an online application in accordance with the Administration's directions.

Alternatively, Hill argues that he did not apply for the new position because he thought it would be futile. In his opposition brief, Hill states he did not apply for the new position because of the experience of other annuitants who did submit a formal application and were not hired. This conflicts with Hill's deposition testimony that he did not apply because the ERC was aware of his qualifications at the time it considered his request to continue in his position and still made the decision to not rehire him, making their preference for someone else clear. Neither justification supports a legal futility argument.

The Supreme Court has held that a non-applicant may pursue claims for discrimination on a showing that the non-applicant was deterred from applying by the employee's discriminatory practices explaining that "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977). This is known as the "futility" doctrine or the "deterred applicant" theory. Courts applying the doctrine have examined the attendant facts and circumstances of the individual case in order to determine the validity of a claim that application would have been futile. For a non-applicant to have standing, "courts look to whether a plaintiff has alleged facts that, taken as true, support the inference that it would have been futile for him to apply

– not simply whether a plaintiff can allege a discriminatory practice." *Wynn v. Nat'l Broadcasting Co., Inc.*, 234 F. Supp. 2d 1067, 1099 (C.D. Cal. 2002). The company must have a "consistently enforced policy" of discriminating against a certain group of individuals for a futility claim to survive. *Teamsters*, 431 U.S. at 365.

Before allowing a non-applicant to challenge discriminatory practices, the Ninth Circuit has required the plaintiff to show a clear pattern of discrimination. *See Bouman v. Block*, 940 F.3d 1211 (9th Cir. 1991) (allowing female plaintiff to pursue discrimination claim when there was clear pattern of discrimination against women and plaintiff told "not to hold her breath" when she asked a superior about her chances of getting promoted); *Reed v. Lockhart Aircraft Corp.*, 613 F.2d 757 (9th Cir. 1980) (allowing female plaintiff to purse discrimination claim when the practice was not to apply for promotions, but be approached by company, and company primarily promoted males); *Gifford v. Atchison, Topeka, and Santa Fe Ry Co.*, 685 F.2d 1149, 1154 (9th Cir. 1982) (allowing female plaintiff to pursue disability claim despite failure to apply for promotion to wire chief where defendant employed no female wire chiefs). While subjective beliefs may play a part in a futility argument, courts have refused to accept a plaintiff's subjective belief as sufficient on its own. *Wynn*, 234 F. Supp. 2d at 1102 n.25.

First, Hill was one of the first Assistant Security Directors to have his Waiver and temporary position end, resulting in the posting of a new permanent position. Prior to the closing date for the new position, no other Assistant Security Director had applied for a new position and been replaced by a substantially younger individual. Therefore, no "consistently enforced policy" of discriminating against protected individuals existed at the time Hill decided to not apply for the new position.

Second, while at least one member of the ERC was aware of Hill's law enforcement

experience, the decision to not extend the term of Hill's temporary assignment was based on a finding that an adequate pool of applicants now existed for the position, not on Hill's qualifications for the new position of permanent Assistant Security Director. Hill's subjective belief that he would not be considered for the new position based on the ERC's decision not to extend his term is not sufficient, on its own, to establish a clear pattern of discrimination against older annuitants.

2. Replaced by Younger Employee

The applicant chosen to serve as the new Assistant Security Director for Portland, Oregon, was forty-six years old at the time of his appointment – ten years and a couple months younger than Hill and a member of the protected class. Beers argues that this differential is insufficient to establish that Hill's replacement was substantially younger.

To create a presumption that a protected employee's termination was discriminatory, the individual hired to replace the terminated worker must be "substantially" younger. "In the age-discrimination context, such an inference can not be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). The Ninth Circuit has held that an age disparity of approximately nine and a half years is not sufficient to justify an inference of age discrimination. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1209 (9th Cir. 2008). In doing so, the court relied on the Seventh Circuit, which has consistently held that replacement employees must be at least ten years younger to justify a presumption of age discrimination. *Id.* (citing *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997).

Here, the ten-year age difference is sufficient to create a presumption, albeit a weak one, that Hill was subjected to discriminatory conduct based on his age. However, that presumption is further

weakened, if not eliminated, by the fact Restovich, one of the individuals making the discriminatory comments,[8] and Whitford, a member of the ERC in attendance at the meeting in which Hill's request for continued employment was addressed, were both older than Hill at the time of the relevant events.[9] *See Brown v. McDonald Douglas Corp.,* 936 F. Supp. 665, 676 n.6 (E.D. Mo. 1996) *aff'd,* 113 F.3d 139 (8th Cir. 1997)("The Court also notes that Ruethain was 40 years old and within the protected age group himself at the time he selected plaintiff for the layoff. This enhances the inference that age discrimination was not the motive behind plaintiff's termination.").

While Hill may have just enough evidence to create a presumption that he was subjected to discriminatory conduct based on the hiring of a substantially younger employee, he has failed to establish that he suffered an adverse employment action. Accordingly, Hill has failed to support a *prima facie* claim for discrimination under the Act.[10]

*Conclusion*

Beers's motion (#21) for summary judgment is GRANTED.

DATED this 11th day of March, 2014.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge

---

[8]The court was unable to determine the age of Rossides, the other individual who made a single discriminatory comment, from the record.

[9]Both individuals indicated shortly after Hill's employment ended they were sixty-one years old. (Def.'s Mem. Ex. 16 at 1-2; Farra Decl. Ex. 1 at 2.)

[10]In light of Hill's inability to establish a *prima facie* claim, the court need not address Beers's argument that the Administration's succession policy provides a legitimate, nondiscriminatory reason for its conduct under the *McDonnell Douglas* burden shifting test applicable to claims under the Act. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).